Fremont-Smith, Thayer, J.
These are consolidated cross-actions between a seller[1] and buyer[2] of real estate wherein both parties seek a declaration by the Court determining which party is entitled to the $200,000 deposit made by the buyer, which is being held in escrow.
The parties entered into a purchase and sale agreement for certain real properly owned by associates known as 111 South Street in Somerville, Massachusetts (“The Property”) on June 8, 2004 and executed a subsequent, superseding Agreement on August 3, 2005 (“the Agreement”). Pursuant to the 2004 and 2005 Agreements, Lofts paid a total of Two Hundred Thousand Dollars ($200,000) as a deposit to be held in escrow by Associates’ attorney as liquidated damages.
The Agreement set forth two conditions precedent to Lofts’ obligation to purchase the Property. First, Lofts’ obligation to purchase the Properly was expressly contingent upon Lofts having secured from the Town approval of a Planned Unit Development (“PUD”) for the Property and all related approvals necessary for the erection of no fewer than 176 residential units, as well as certain parking spaces (the “Approvals”). Based on all of the credible evidence, the Court finds that the Somerville Planning Board did grant final approval on September 21, 2006, thus satisfying the first condition precedent. [3]
The second condition precedent was Lofts’ delivery to Associates of a letter of commitment from an accredited lending institution, subject to all standard and customary underwriting requirements, for the financing of the project. This letter of commitment, by Intercontinental Real Estate Investment Fund IV, LLC, was delivered to Associates on September 16, 2005 and was accepted by it,[4] thus satisfying the second condition precedent.
The Agreement contained no defined closing or any time period when Lofts’ rights under the 2005 Agreement were to expire or terminate.
Pursuant to Paragraph 37 of rider A of the Agreement, the time for delivery of the deed and payment of the balance of the purchase price “shall be not more than seven (7) days after all applicable periods of appeal for all Approvals have expired.” There was a twenty-day appeal period from the Planning Board’s September 21, 2006 approval so the appeal period expired on October 11, 2006. No appeal was filed.[5]
In view of the above conditions precedent having been satisfied, Associates, on September 26. 2006, and again on October 2, asked Lofts to set a definite closing date.
By this time, however, Lofts and its financial backers were having second thoughts about going forward with the deal.[6] After the PUD approval was granted on September 21, 2006, Lofts, on September 22, 2006, without notifying Associates, communicated to the Planning Board Lofts’ unhappiness with the Planning Board’s having given final approval to the Planned Unit Development and asked it to reconsider.[7] The Planning Board did so by a writing on October 12 stating that the September 21 PUD Approval had not, after all, been intended to have provided final site plan approval. Lofts thus unilaterally and secretly caused the Planning Board to revoke its September 21 decision approving the project, without having notified Associates of its intention to do so. Far from exercising reasonable efforts to secure the approval required by the Agreement, see Stabile v. McCarthy, 336 Mass. 399, 404 (1957), Lofts intentionally sabotaged the approval which had already been given.
From and after the time it received the Planning Board’s revised opinion on October 15, Lofts has consistently denied that it was obligated to close, contending that no final approval had been obtained.[8] Then, Lofts and Intercontinental verbally made it clear to Associates, starting on October 23, 2006, that they were not going forward under the original 2005Agreement in any event, i.e., that they would not close at the agreed-upon purchase price, but would supply Associates with a writing requesting a new purchase price. This it did five weeks later, on November 28.[9] While Lofts’ letter dated November 28, 2000 was couched in terms of a request, stating “we respectfully ask that you consider revising the economic structure of our purchase and sale agreement,” *206 when considered in the context of Lofts’ other actions and communications described above, the Court finds that Lofts had unambiguously indicated its repudiation of its Agreement.
By declining to agree to a closing date pursuant to para. 37 of Rider A, [10] by renouncing its intention on October 23, 2006 to ever pay the original agreed-upon purchase price, by confirming that refusal on November 28, and by its other conduct described above, Lofts was in material breach of the 2005 Agreement, which it never cured. After October 23, 2006, moreover, Lofts never communicated to Associates that Lofts was still willing to go forward at the purchase price stipulated in the 2005 Agreement.
Lofts further breached the 2005 Agreement and made clear that it did not intend to perform when, starting November 15, 2006, it ended its financing arrangement with Intercontinental, which effectively terminated Lofts’ ability to close. As noted, proof of financing capability by an “accredited lending institution” was a requirement of performance by the Buyer and was an indisputably material term. See 2005 Agreement, Rider A, paragraph 47(L). Intercontinental was the sole financing partner of Lofts until December 13, 2006, but by December 30, 2006 Lofts had “closed out” its financing agreement with Intercontinental and had no accredited substitute financing in hand.[11] Consistent with Lofts’ earlier unilateral termination of the Agreement, on December 11, 2006 Lofts asked Associates (Joseph Vaccaro) for “return of the deposit,” which Vaccaro refused.
The Court rules, based on all of the credible evidence, that Lofts was in material breach of the Agreement from and after October 23, 2006 entitling Associates to declare a default, as it did on November 22, 2006. I further rule, and this Court declares, that the Agreement contains a valid and enforceable liquidated damages provision and that Boynton Yards Associates I, LLC is entitled to recover the Deposit in the sum of $200,000 plus all accrued interest in the account established by the Escrow Agreement of defendant William R. Hall, Esq.[12]
ORDER FOR JUDGMENT
Accordingly, judgment shall be entered for Boynton Yards Associates, I, LLC against Boynton Yard Lofts, LLC in the sum of $200,000 plus interest from November 22, 2006 and costs, and the escrow agent, William R. Hall, Esq. is ordered to pay the $200,000 escrow amount and all interest accrued thereon[13] to Boynton Yards Associates I, LLC within ten days.
The counterclaim of Boynton Yards Lofts LLC for a contrary declaratory judgment is DISMISSED.[14]

Boynton Yards Associates, LLC (“Associates”).

Boynton Yards Lofts, LLC (“Lofts”).

Lofts’ owner admitted that the Planning Board’s September 21, 2006 approval, if not revoked, provided complete approval of the Planned Unit Development.

The Agreement provided that “Seller shall have three (3) business days after its receipt of such letter to give notice to Buyer of any reasonable objections to the letter. If such notice is not timely given, Seller’s right to object to the letter shall be waived.” Associates did not object to the Intercontinental commitment letter.

Lofts, in seeking the PUD designation, sought designation of the site of the PUD Master Plan with Site Plan Review Application and with Variances. The April 11, 2006 Application by Lofts, consistent with the intent of the parties, represented that “upon successful approval of the above referenced Special Permit with Site Plan Review and Variance (Trial Exhibits, Bates 0051) Lofts "will purchase the existing 111 South Street property under the existing 2005 Agreement with Associates." (Emphasis added.)

Lofts’ owner testified that the real estate market was softening at that time.

This violated paragraph 31 of Rider A to the Agreement which provided that “Buyer shall keep Seller fully and candidly apprised (verbally or in writing as dictated by reason) of all material interactions with any governmental authority with request to the Approvals.”

Even if final approval of the PUD had not been received, as Lofts contends, Lofts did not diligently pursue final site plan review after the Planning Board’s October 12 letter, but secretly refused to do so. As of October 25, the attorney for Lofts (Ianuzzi) was preparing a “final” submittal to the Planning Board for November 15. He had already requested a December 7 final approval date for all site permits. Lofts’ owner however, admitted that he instructed Ianuzzi not to deliver the November 15, 2006 materials to the Planning Board, with the result that no additional “final approval” was ever forthcoming. This violated the provision of Rider A, paragraph 31, that “buyer agrees to commence and in good faith, diligently continue its efforts to acquire permits and approvals for Buyer’s use of the Property.”

The offer was for a lower sale price and an indefinite delay in payment until the project was completed and profits were realized so as to conform to “new market conditions” as perceived by Lofts.

Paragraph 37 of the Rider states: “the time for delivery of the deed for the Property to Buyer herein and for Buyer’s payment of the balance of the purchase price due to Seller shall be not more than seven (7) days after all applicable periods of appeal for all Approvals have expired with no appeals having been filed.”

 Lofts subsequently did line up provisional (but not unconditional) financing for the proposed reduced purchase price, and never thereafter indicated it would close at the original agreed-upon purchase price. Associated rejected all of Lofts’ attempts to renegotiate the deal.

Neither party disputes that the liquidated damages clause of the Agreement is valid and enforceable.

The amount of accrued interest paid to Associates by Hall shall be applied so as to reduce the amount of statutory interest owed, so that Associates will not end up being paid more than the amount of statutory interest. Associates will, pursuant to this judgment, notify the Court of the amount of interest on the deposit which is received from Hall.

As the Court’s decision resolves the declaratory judgment counts of the complaint and counterclaim, but there may remain other counts in the complaint and counterclaim which are not entirely resolved by this decision, all such claims of the parties in the two actions are reserved for jury trial, except that the Court reserves for itself resolution of any claim for violation of G.L.c. 93A. The Court does not determine whether the Agreement’s “exclusive remedy” provision may bar any such other relief. The parties shall, within 10 days, file a status report as to whether either party is requesting an additional trial, and designate the counts of the complaint or counterclaim as to which a jury trial is requested.