Fahey, Elizabeth M., J.
INTRODUCTION
This case was tried before a jury for 14 days in November and December 2010. This Court reserved the Plaintiffs Chapter 93A claim and now states its Findings of Fact and Rulings of Law and Order of Judgment.
The jury found that the defendant Lorillard Tobacco Company (“Lorillard”) negligently marketed (Count VII) and negligently failed to warn (Count VII) consumers, including Marie Evans in its marketing efforts, both pre-1979 and post-1979. The jury also found that Lorillard breached the implied warranty of merchantability (Count III) in that the cigarettes it sold after 1979 were unreasonably dangerous as I) they intentionally and by design contained addictive levels of nicotine; 2) they contained unnecessary levels of carcinogens in the smoke; and 3) they contained menthol. In so doing, Lorillard violated Chapter 93A. Defendant also violated Chapter 93A by breaching the voluntary duty it undertook (Count II) to accurately report to the public its research and knowledge concerning the health risks of smoking cigarettes.
FINDINGS OF FACT
In making its findings, the court is not constrained by the jury’s findings on the common-law claims, as the jury’s findings do not have a preclusive effect on the c. 93A claim. Chamberlayne Sch. & Chamberlayne Junior Coll. v. Banker, 30 Mass.App.Ct. 346, 354-55 (1991). This court makes the following findings.
This is an action brought by Plaintiff Willie Evans, the Executor of the Estate of his mother, Marie Evans, against Lorillard, the manufacturer of Newport cigarettes.
Ms. Evans was born on October 23, 1947, and grew up in Orchard Park Housing Project in Roxbury, Massachusetts. Ms. Evans began smoking Newport cigarettes at approximately age 13, became addicted to *208 nicotine shortly thereafter, and remained addicted and continued to smoke Newports throughout her life. Though she genuinely desired to and tried to stop smoking on some 50 occasions, she was unsuccessful except for very short periods, the longest being several months. Ms. Evans was addicted to the nicotine delivered by Newport cigarettes, and this contributed substantially to her continued use of the product. Ms. Evans died on June 20, 2002 from small cell lung cancer caused by smoking Newport cigarettes.
Lorillard is a Delaware corporation with its principal place of business in Greensboro, North Carolina. Lorillard designed, manufactured, and distributed Newport cigarettes since it introduced the Newport brand in 1957. Since it introduced Newport, Lorillard targeted youth, including African-American youth, in an effort to attract and addict young smokers who would become lifelong smokers of Newport cigarettes. I discredit the testimony of Lorillard’s corporate representative, Leonard Jones, that the market for Newport was the “adult menthol smoker”; the evidence was overwhelming that Lorillard’s target market included children, like Marie Evans. Examples of Lorillard’s marketing to children include:
1. I credit the testimony of Marie Evans, Leslie Adamson, Tlpp Harris, Rosalyn Harris, and Robert Henry and others that they received free cigarettes in and around Orchard Park on numerous occasions when they were very young. Some witnesses specifically testified that the cigarettes were Newport cigarettes; others (non-smokers) testified that the cigarette packages had colors similar to those of Newport cigarettes. At no time were they denied cigarettes or asked their age. Tipp and Rosalyn Harris’s mother called the people giving away Newport cigarettes the “enticers.” (Tr. 2051.) Sampling of Newport cigarettes, including giving free cigarettes to children like Marie Evans and many others, began approximately at the time of the introduction of the Newport brand in 1957. The evidence of these giveways included the testimony of individuals who recalled the events, as well as Lorillard’s annual reports and internal documents.
2. In response to a 1960 written request by a high school freshman for information about its cigarette paper and whether it is perforated, Lorillard responded and sent under separate cover, “our soft package of Spring cigarettes which we hope you wall thoroughly enjoy.” Ex. 116.
3. An internal Lorillard memorandum dated September 15, 1964 reported that Newport was intended to be a “fun cigarette . . . (sic) It was advertised as such and obtained a youthful group as well as an immature group of smokers” and reported that Newport was “marketed successfully according to plan.” Ex. 136[1], [2] Its original advertising budget when the “Newport brand was born” in 1956 was $900,000.00.
4. An internal Lorillard memorandum Ex. 164 dated June 5, 1978 identified “sampling” as one of its cigarette marketing strategies. One “promotion idea” included “How to Reach Younger Smokers.” Lorillard knew Newports were smoked by those in high school, college and older. Lorillard’s “target group” was age “16+.” Marketing devices by Lorillard included sponsorship of youth teams or youth sporting events.
5. An internal Lorillard memorandum concerning its best selling brand Newport dated August 30, 1978 touted that “the base of our business is the high school student.” Ex. 165.
6. There was no evidence of any investigations or disciplinary actions on the part of Lorillard, even when confronted with complaints or other comments concerning the distribution of their cigarettes to children. See Ex. 126.
7. An aggressive and ubiquitous advertising campaign featuring radio, television, print, and billboard advertisements created an image of smoking described by the Federal Trade Commission in 1967 as “harmless and satisfying.” Ex. 50. In the summer of 1964, for example, Lorillard arranged for 65 radio announcements per week, and 252 billboards in the Boston/Worcester region. Ex. 847.
8. Defendant’s Corporate Network TV Activity for January 1968 shows that it tracked its TV advertising exposure by Age Groups including children (ages 2-11) and teens ages 12-17. (Ex. 190.)
9. In 1982, Defendant suggested that for “youth appeal" and “lasting appeal,” video game images could appear on cigarette packages. (Ex. 301.)
10. Even as late as 1990, this Defendant’s Sr. VP-General Counsel wrote to its attorney about obtaining market demographic data, including the “teen study” for those 12-17 years of age.
Though it signed onto a Cigarette Ad Code which precluded distribution/marketing of cigarettes to students, Lorillard never complied with that Code. The evidence convincingly established that over decades Defendant marketed its cigarettes, including New-ports, to minors. Ex. 1007, 1008, 1009. Defendant sampled its free cigarettes in boxes of 4 cigarettes to persons, including minors, in Boston at various times from 1957-1983, when street sampling of cigarettes became illegal in Boston. Defendant’s free sampling of its cigarettes occurred through either defendant’s employees or its authorized agents. (Ex. 364, 359, 370, 124, 125, 127, 129-34.) Even Defendant’s representative Leonard Jones agreed Defendant never had any written policy not to provide children with free samples of its cigarettes in 1957-1964. There is no question but *209 that this defendant over decades pre-and post-1979 targeted youths, children under age 18, as sought-after marketing targets of its cigarettes, including Newports.
By 1939 Defendant had done abstracts of at least 82 articles in the scientific and medical literature concerning laboratory animals that had been painted with tar for research purposes and developed cancer. By 1946, Lorillard’s internal documents reveal that it was on notice that “(c) certain scientists and medical authorities have claimed for many years that the use of tobacco contributes to cancer development in susceptible people. Just enough evidence has been presented to justify the possibility of such a presumption.” (Ex. 506 letter from Defendant’s Chemist to Defendant’s Secretary, Committee on Manufacturer dated July 29, 1946.) Defendant’s author “hope(d) that the chemistry project .. . will give us a better insight on subjects, such as throat irritation and even carcinogenesis.” Ex. 506.
Between 1940-1950 at least four studies had linked smoking cigarettes with lung cancer. By 1950 the defendant was aware of a substantive association between smoking cigarettes and lung cancer. I accept Dr. Cumming’s testimony that by 1958, even before Ms. Evans started smoking, it was no longer reasonable for this Defendant to debate that smoking cigarettes caused lung cancer. Ex 73, 19.
During 1950-1964, there was extensive media coverage about the health hazard/risks of smoking, some of which suggested that smoking may cause lung cancer.[3] To combat this, in 1954, several cigarette manufacturers, including Lorillard, jointly ran an advertisement in newspapers around the country entitled “A Frank Statement to Cigarette Smokers” (“Frank Statement”).[4] This 1954 Frank Statement was the response of defendant and other tobacco companies to growing scientific and medical research showing the health risks and hazards of smoking. By this advertisement, defendant pledged to the public its financial aid to establish the Tobacco Industry Research Committee (“TIRC”) to research “all phases of tobacco use and health.” (Ex. 21.) The “Frank Statement” (Ex. 21) was not made gratuitously. Signed by most major tobacco manufacturers, including Lorillard, the Frank Statement was a full-page ad in major newspapers across the US in cities with populations over 25,000; it reached over 40 million Americans when it was published on January 4, 1954. This Statement was designed to maintain or increase sales of cigarettes as part of a plan by cigarette manufacturers, including this Defendant, to rebut growing awareness of cigarette dangers through a “public relations campaign” that was “entirely ‘pro tobacco.’ ” (Ex. 20.)
With the Frank Statement, Lorillard and other cigarette manufacturers claimed that “there is no proof that cigarette smoking is one of the causes [of cancer].” (Ex. 21.) These manufacturers, including Lorillard, pledged to smokers that they “accept an interest in people’s health as a basic responsibility, paramount to every other consideration in our business. We believe the products we make are not injurious to health. We always have and always will cooperate closely with those whose task is to safeguard the public health.” {Id.) By this Frank Statement, defendant represented that the research of TIRC would be led by “a scientist of unimpeachable integrity and national repute. In addition, there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men from medicine, science and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.”
This voluntary duty was publicly re-affirmed multiple times by Lorillard and other cigarette manufacturers, including in 1958 (Ex. 33) and 1977 (Ex. 74). In 1960, the year Marie started smoking, Lorillard “accepted a responsibility for financing independent scientific research into health problems, including lung cancer, in an effort to get needed facts and evidence.” (Ex. 35.)
Lorillard’s goal in issuing this Frank Statement to cigarette smokers was to reassure and convince the public that there is a legitimate controversy about whether there is any proof that cigarette smoking causes cancer and/or health issues (Ex. 21) and that this Defendant had “an interest in people’s health as a basic responsibility, paramount to every other consideration in our business.” (Ex. 21.) Since at least 1956, Defendant’s Research Division had “been investigating the tumorigenic properties of cigarette smoke condensate toward mouse epithelium . . .” (Ex 532.) “(T)hese studies stemmed from numerous reports attempting to implicate cigarette smoke as a causative factor in human lung cancer.” (Ex. 532.) A.W. Spears, Defendant’s Research Director, advised Defendant’s President “that the development of a cigarette, the smoke condensate from which gives little or no tumorigenic responsive, would be regarded as a highly significant development in the scientific community” and could result in a two or threefold increase in sales ..." Even while advising the public of its research into smoking and health, defendant’s main, if not sole, purpose was to increase its cigarette sales. See also Ex. 527 dated September 30, 1963 and Ex. 532 dated May 25, 1966.
Lorillard participated in the 1954 issuance of the Frank Statement because it realized that the public was increasingly understanding that smoking cigarettes caused cancer and other health effects. (Ex. 39.) The Tobacco Institute (“TI”) (Ex. 69), the public relations entity of this Defendant and other cigarette manufacturers, over decades since 1958[5] helped or *210 chestrate for this defendant and TI’s other members the strategy of “creating doubt about the health issue without actually denying it.” (Ex. 67 dated May 1, 1972.) Lorillard knowingly and intentionally supported this strategy, suggesting that “the case is not proved" (Ex. 67), all the while knowing of, and failing to reveal, substantive, credible scientific research to the contrary.
“The Counsel for Tobacco Research (“CTR”), formed in 1954 by cigarette manufacturers, including this Defendant, describes its primary mission as support of research into questions of tobacco use and health.” Ex. 92. When CTR’s funded researchers were polled, many (46%) of the responding scientists (77/166) funded by CTR “believe cigarette smoking is an addiction that causes a wide range of serious, often fatal, diseases, including lung cancer.” (Ex. 92.) Notwithstanding that opinion by many of their own scientists, CTR and the tobacco industry, including this defendant, continued to claim for decades that it was not yet proven that smoking cigarettes causes cancer and denied that smoking has been proven to cause disease. This Defendant participated for decades in this sham on the public, “profess (ing) a desire to clear up the smoking and health ‘question’ ” and “often point(ing) to its support of the CTR as evidence of its interest in investigating the health dangers of smoking.” (Ex 92.) Even by July 29, 1977, defendant’s Research Director A.W. Spears “d(id) not want Lorillard to report identifiable data on human smoking behavior.” (Ex. 75.)
By August 1961, Dr. Spears had been involved, as Lorillard’s Research Director together with Armour Research Foundation and Sloan-Kettering Institute, in studies “toward the reduction of carcinogenicily of cigarette tar.” Ex. 277. The paramount goal of Lorillard’s research was to “achieve long term use" by smokers of cigarettes, even over consumer satisfaction.
By 1973, almost two decades after it participated in the Frank Statement, Lorillard knew that both female and male smokers were prone to the same illnesses. (Ex. 151.) By 1973 Lorillard also knew “that women, particularly working women, have less success in quitting and staying off cigarettes.” Ex. 151. However, Lorillard’s internal documents/statements contain dramatically different statements than its external statements, the latter suggesting for almost the next three decades that any health effects from smoking were not yet proven.
Internally, LTC admitted in a 1974 memo (Ex. 70) that the scientific studies funded by LTC and the other tobacco companies were “not selected against specific scientific goals, but rather for various purposes such as public relations, political relations, position for litigation, etc. Thus, it seems obvious that reviews of such programs for scientific relevance and merit in the smoking and health field are not likely to produce high ratings.” (Ex. 70, Tr. 1356-62.) Therefore, it is reasonable to conclude that LTC had not only failed to perform the duty that it undertook, but also that LTC used the impression that it created to confuse the public about smoking and health.
Defendant’s campaign to mislead the public began with the Frank Statement and continued at least through its CEO’s incredible testimony to Congress in 1994. Despite its knowledge to the contrary, Defendant’s CEO testified that it was not proven whether smoking cigarettes caused cancer and that nicotine is not addictive.[6] Defendant’s campaign of deceiving the public, including Marie Evans, as to the health issues of smoking began with the issuance of the Frank Statement in 1954. Defendant’s campaign of deceit and deception continued for decades, even after the 1979 Amendment to Mass. G.L.c. 93A.
One purpose of the Frank Statement was to establish a Scientific Advisory Board “devoted only to the development of scientific knowledge, let(ting) the chips fall where they may” (Ex. 629) according to a March 1, 1956 editorial in the New England Journal of Medicine. As was noted, “(t)he proper role is not that of concealment, if the suspicions now directed down Tobacco Road are substantial, but that of openly and honestly acknowledging the existence of a toxic factor and trying to eliminate it.” (Ex. 629.) However, not only did it deny the existence of a toxic factor, Lorillard concealed for decades its knowledge of the toxicity of its Newport cigarettes. By the late 1950s, it was accepted among the mainstream scientific community that smoking cigarettes was a cause of cancer. Despite its own knowledge and that of the scientific community, Lorillard engaged for decades in a campaign to deceive the public about the health effects of smoking, breaching its promise in the Frank Statement. Lorillard continued its campaign to deceive the public about smoking and health through and after 1979. Lorillard did not do what it promised in the Frank Statement.
I accept Dr. Cumming’s testimony that, from the 1950s through at least the 1990s, the Defendant’s public statements were that cigarettes were not addictive and that it was not proven that cigarettes were injurious to human health. I accept that while making these public statements, defendant’s scientists and researchers knew the opposite.
Even worse, Lorillard’s goal as ofFebruaiy 13, 1980 was to “(d)etermine the minimum level of nicotine that will allow continued smoking.” Ex. 337, 254.[7] This memo was stamped “SECRET.” Lorillard’s author “hypothesize(s) that below some very low nicotine level, diminished physiological satisfaction cannot be compensated for by psychological satisfaction. At this point, smokers will quit or return to higher T and N (tar and nicotine) brands.” (Ex. 337, 254.) Lorillard *211 also noted that “(l)evels of health concern vary, and are directly related to the T&N levels of regular brand.” Ex. 337, 254.
Lorillard developed techniques to manipulate and control the nicotine delivery of its cigarettes so as to create and sustain addiction of smokers, including Marie Evans. As a result, Newport cigarettes intentionally contain nicotine in addictive amounts. Nicotine triggers a biochemical reaction in the body that causes the release of dopamine, which is a naturally occurring chemical within the body, the release of which makes one feel good or satisfied. The nicotine in the Newport cigarettes smoked by Ms. Evans was at a level high enough to create and maintain a chemical addiction in her. As Dr. Farone explained, cigarette manufacturers make adjustments to the design of any given brand of cigarettes to adjust the nicotine level on an ongoing basis. “[C]igarette design, which is unique to eveiy product, is usually changed approximately three or four times a year as they use up various stocks of tobaccos they have in the warehouse . . . there’s a constant engineering going on to keep the tar and nicotine level where they want it.” Trial Transcript at 1770:17-1771:4. This was true of the Newport cigarettes smoked by Ms. Evans.
Lorillard had the technical capacity to remove nicotine from the tobacco it used in its cigarettes, including Newports, since the 1940s. The process of creating reconstituted tobacco, an engineered form of tobacco from which nicotine is extracted and later reinjected to achieve a precise dosage, is just one example of a method that could be used to reduce the level of nicotine. Lorillard uses this process regularly in its manufacture of Newport cigarettes, but chooses not to employ this technique to eliminate or reduce nicotine to a nonaddictive level.
In 1964, the Surgeon General of the United States issued a Report which stated that smoking cigarettes causes lung cancer and heart disease. The 1964 Surgeon General’s Report received extensive publicity, including being on the front pages of newspapers across the country, in magazines, and on television.
In 1965 Congress enacted The Federal Cigarette Labeling and Advertising Act (“the Labeling Act”). Section 4 of the Labeling Act required all cigarette packages to have a label stating: “Caution: Cigarette Smoking May Be Hazardous to Your Health.” Congress mandated the warning and told cigarette manufacturers exactly what the warning must say, where on the package it should be placed, and the size of the font.
The Public Health Cigarette Smoking Act of 1969 (“PHCSA”) became effective in 1970. The PHCSA amended the Labeling Act by strengthening the required warning label to: “Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health.” Congress continued to dictate the content, size, location, and font of the warning.
In 1985, Congress again amended the Labeling Act concerning warnings on cigarette packs, and mandated a new set of rotational warnings that included the warnings that “smoking causes lung cancer and heart disease” and that “quitting smoking now greatly reduces serious risk to your health.” As a result of these Congressional actions, every pack of Newport cigarettes that Marie Evans smoked from 1966 until the time she died contained a warning about the health hazards of smoking.
Ms. Evans saw some warnings about the health risks of smoking that have appeared on cigarette packs since the 1960s. She recalled that these warnings changed over time and, at one point, specifically stated that smoking can cause lung cancer and heart disease. While Ms. Evans had never specifically heard of the Frank Statement or its progeny, she had read and heard of the "public debate” concerning whether cigarettes caused lung cancer and/or other health issues.
When she was a teenager, Ms. Evans read Jet and Ebony magazines: Newport ran advertisements in those magazines during the 1960s. She could not identify any specific ad, but could only say that two ads from 1965 seemed to be like ads she saw. The ads, showing a handsome African-American couple smoking, made her want to “look like her” and “marry him.” When her father, a life-long smoker, died of lung cancer in 1970, Ms. Evans drew a connection in her own mind between her father’s lung cancer and his having been a lifelong smoker. Ms. Evans was also aware by then that smoking had also been linked to causing heart disease. When Ms. Evans was pregnant in 1970 with the Plaintiff, her physician advised her to quit smoking due to the health hazards of smoking and the harm it could have on her unborn child. She did not stop smoking in 1970 due both to her addiction and the conflicting information she had, the “public debate.” By 1970, if not before, Ms. Evans was aware that there was a “public debate” about whether cigarettes are addictive and can cause lung cancer and/or heart disease. This “debate” was basically between the Surgeon General and independent scientists on one side and the tobacco companies, including Lorillard, and their agents on the other. These conflicting reports, this “public debate,” on smoking and its health effects, allowed Ms. Evans to reasonably conclude that it had not been determined whether her continued smoking was harmful. I accept that due to her enjoyment of smoking and her addiction, she preferred to conclude that her continued smoking was not harming her health. If she had been able to quit smoking in 1970, Ms. Evans would have reduced her risk of developing lung cancer in 2001 to near that of one who had never smoked. The risk *212 of developing small cell lung cancer in one who has never smoked is less than 1 in 10,000. Had Ms. Evans been able to quit smoking in 1985, her risk of developing small cell lung cancer would have been only 3 to 5 in 10,000 by 2001.
In addition to her father’s smoking-related lung cancer, Ms. Evans was aware that she had a “very strong” family history of heart disease and lung cancer, including that her mother suffered from heart disease and died from a heart attack, and her brother died from a heart attack in his mid-20s. Three of her sisters suffered from heart disease and two of them died from heart problems. Other members of her extended family have also suffered from heart disease and cancer. Ms. Evans’s family and friends also repeatedly advised her about the health risks of smoking and urged her to quit. Plaintiff himself routinely did so, even as a very young child.
In 1985, Ms. Evans suffered a heart attack. Ms. Evans immediately tried to stop smoking cigarettes, but she struggled to overcome her lifelong addiction to nicotine caused by smoking Newport cigarettes. This heart attack was a scaiy “wake up call” as she realized concretely that smoking could well be contributing to her heart problems. Notwithstanding this realization, she was then, and previously, unable to quit due to her strong addiction to nicotine since she was a child. I accept Dr. Benowitz’s testimony that the earlier one starts smoking the more likely one becomes addicted and more severely addicted, and thus the harder it is to quit smoking. Where Ms. Evans was addicted to Newport cigarettes by age 13 as a result of Defendant’s free samples/giveaways to the public, including Ms. Evans, who received them by age 9, I accept that she was severely addicted. From all that Ms. Evans saw and read over decades, she understood there was a genuine legitimate controversy as to whether smoking cigarettes caused heart conditions and/or lung cancer. Since at least some of what she relied on for this came from what the Defendant or its agents/representatives (TI, TIRC, CTR) generated for the public, the Defendant cannot then defend by relying on the explicit warnings of the Surgeon General. Due to the addiction to nicotine caused by smoking Newport cigarettes, Ms. Evans did not have a “free choice” whether to continue to smoke or not. Even the Defendant’s personnel knew this by 1980 when one wrote in Ex 82 “we can’t defend continued smoking as free choice if the person was addicted.” This court accepts that the majority of Americans had, even by 1954, heard or read that cigarette smoking may be a cause of lung cancer. However, to counter that, defendant repeatedly over decades, at least through 1994, represented to the public that cigarette smoking did not cause lung cancer and/or that there was a genuine scientific debate about that issue. Unfortunately, the defendant made those representations with documentation in their records for decades showing that cigarette smoking causes cancer. The defendant acted with other tobacco companies to fabricate afalse debate about whether cigarette smoking caused lung cancer. In a 1966 US Public Health Survey poll, 57% of respondents agreed that “current cigarette advertising leaves the impression that smoking is a healthy thing to do.”
Ms. Evans was diagnosed with small cell lung cancer during December 2001-January 2002. She died six months later from this small cell lung cancer caused by having smoked Newport cigarettes. Smoke from Newport cigarettes contains carcinogens. The carcinogenic properties of the Newport cigarettes smoked by Ms. Evans caused her death.
It is undisputed that cigarettes are addictive and carcinogenic. Nicotine makes cigarettes addictive; the tar in tobacco causes cancer. While nicotine occurs naturally in tobacco, Lorillard has, for decades, had the ability to enhance, and has enhanced, the amount of nicotine in each cigarette so as to ensure that each cigarette contains enough nicotine to be addictive.
Since they were introduced in 1957, Newport cigarettes have contained menthol, a chemical derivative from mint that sedates and suppresses the gag reflex experienced by many smokers, particularly new smokers. This additive, available since the 1930s, makes Newport cigarettes dangerous in a distinct way, as compared to non-menthol cigarettes, in that it enables the smoke from Newport cigarettes to be inhaled more easily than it otherwise would be because menthol suppresses the body’s natural gag reflex/cough from inhaling smoke. This feature makes Newport cigarettes particularly dangerous to new smokers because it facilitates smoke inhalation in longer increments, thereby increasing the body’s exposure to nicotine. The inclusion of menthol helps to initiate, and ultimately to addict, new smokers. While Lorillard never hid the fact that Newport cigarettes contained menthol, none of Lorillard’s labeling described the purpose or effect of the addition of menthol to a cigarette. While no evidence was offered that smokers of menthol cigarettes are at any greater risk of disease or become more addicted than smokers of non-menthol cigarettes, one primary purpose for which Lorillard markets Newports as a menthol cigarette is to enable the smoker to enjoy and become addicted more easily.
Cigarettes are a highly engineered product; Lorillard can and does adjust the amount of tar and nicotine in each cigarette. Lorillard knew or should have known by 1964 that cigarettes, including Newport cigarettes, cause lung cancer, including small cell lung cancer. Even though the Defendant knew since the 1940s how to manufacture a low-or no-nicotine cigarette, it has never done so. Defendant’s marketing of cigarettes, including Newports, is calculated and *213 designed to include marketing cigarettes with at least enough nicotine so as to cause and maintain addiction of the smoker to nicotine: i.e. to cause continued purchases of its cigarettes.
Newport cigarettes contain addictive levels of nicotine. In the words of a Lorillard employee, “[cigarette sales are made for one reason. The customer is satisfied with the product either from the taste or the physiological satisfaction derived from the smoke. The consensus of opinion derived from a review of the literature on the subject indicates the most probable reason for the additive properties of the smoke is the nicotine.” Ex. 230. There was credible evidence that this acknowledgment by Lorillard was consistent with what was known by scientists at that time.
Lorillard understood that smokers smoke for nicotine. It pursued research to determine the minimum level of nicotine necessary to maintain addiction among smokers. A Lorillard memo includes the statements: “Goal — Determine the minimum level of nicotine that will allow continued smoking,” and “below some very low nicotine level... smokers will quit.” Ex. 254.
Lorillard’s purpose of maintaining nicotine at this level was to promote and maintain addiction among consumers of Newport cigarettes, including Ms. Evans. By promoting and maintaining addiction to nicotine among consumers of Newport cigarettes, including Ms. Evans, Lorillard’s goal was to promote continued sales of its product.
By April 1977, “(e)nriched nicotine . . . continues to be Lorillard’s highest priority project.” Ex. 244. The Defendant’s “consensus was that maintaining product taste is generally more important than maintaining tar levels; . . .” Ex. 244. Later that month, Defendant’s Research Center determined both that only insignificant amounts of nicotine were being lost in the manufacturing process and that nicotine can be added to the manufacturing process, “(t)hus ensuring that there will be ’’predictable levels of nicotine in the final product.’ “ Ex. 245. Lorillard desired to have precise control over nicotine contents in all its products with predictable levels of nicotine in the final product. The purpose of adding nicotine to the tobacco when necessary to have ’’predictable levels of nicotine" was to ensure that defendant’s brand would contain enough nicotine to maintain the smoker’s addiction. Defendant called this research its “Nicotine Enrichment Project.” Ex. 246. Defendant was so eager to maintain sufficient nicotine levels in its cigarettes that it even researched whether treating tobacco with ammonia would “liberate nicotine” qualitatively and quantitatively. Fortunately, that research approach was discontinued. Ex. 246, 247.
By 1976 it is clear to Defendant, at least in its Research Center, that “(e)pidemeological studies indicate that smokers showed increased morbidity and morality attributable to coronary heart disease.” Ex. 236. Defendant also knew by 1976 that “smoke doses ofnicotineare known to induce.. .elevation of arterial blood pressure . . . (and other conditions) which are . . . risk factors in cardiovascular disease, . . Ex. 236. Lorillard also knew at least since 1976 that nicotine has “extensive effects upon the autonomic respiratory and neuromusculature systems.” Ex. 236 By then defendant knew “it was considered desirable to reduce the nicotine content of cigarettes.” Ex. 236. However, this reduction in nicotine could not go too far as by April 1977 it is clear to Lorillard that a smoker’s “physiological satisfaction is almost totally related to nicotine intake.” Ex. 246. Notwithstanding Defendant’s knowledge before 1976 that smoking increased the risk factors of cardiovascular disease as well as cancer, Defendant’s written and verbal statements denied this and made it seem that there was a legitimate scientific inquiry on this question of what injury is caused to humans by smoking.
In a memorandum dated July 22, 1977, Lorillard’s F.J. Schultz instructed Dr. A.W. Spears, Lorillard’s Director of Research, “Consideration of nicotine delivery to achieve long term use and satisfaction by the consumer dictate that we should continue to pursue the concept of nicotine enhancement.” Schultz had been working on a 2 mg. nicotine project but determined that “(c)onsideration of nicotine delivery necessary to achieve long term use and satisfaction by the consumer dictate that we should continue to pursue the concept of nicotine enhancement. The level of nicotine in the smoke required to produce the desired results is an unknown factor, however we have estimated it to be in the neighborhood of 0.4-0.5 mg. per cigarette.” Exhibit 249. Lorillard apparently never went forward with this reduced nicotine cigarette. Even though this new manufacturing process would have been more expensive, those increased “costs would be more than offset by the reduction in the amount of tobacco used.” (Ex. 249.) Notwithstanding what could have been competition in the marketing of a “safer” cigarette, i.e., compared to Carleton, Now and Quest, Lorillard declined to enter this market, preferring to continue its marketing of addictive, carcinogenic cigarettes.
Lorillard responded in May 1963 to the U.S. Surgeon General’s Advisory Committee on Smoking and Health with its Materials on Cigarette Filtration. (Ex 280, 525.) Responding to the Surgeon General’s request for “data of relevance on the nature and magnitude of health hazards from smoking,” Lorillard initially responded to “the claimed association between smoking and various diseases” by saying that it “is based largely upon statistics which have been challenged both as to adequacy and methodology, and is lacking in probative physiological or *214 clinical substantiation.” While Lorillard claimed that it “d(id) not believe the serious health charges against cigarette smoking have been proved,” Lorillard was “deeply concerned,” enough to begin focusing on “developmentofcigarettes designed to reduce the amount of the suspect components of smoke and thereby to mitigate or eliminate the alleged health hazards." Lorillard thenfocusedoncigarettefiltration, especially of tar, nicotine and phenol.
In May 1963, Dr. James M. Hundley, the Assistant Surgeon General of the United States Public Health Service, received Lorillard’s report to the Surgeon General’s Advisory Committee on Smoking and Health. Lorillard’s report stated:
[t)he use of filters to reduce the tar yield of cigarettes has become widespread since the mid-1950s. Filters can be devised which remove 100 percent of the tar or particulate matter of cigarette smoke, but since tar contains principal flavor elements of smoke, the smoke thus filtered becomes tasteless and unsatisfactoiy to the smoker. Therefore, manufacturers have controlled both tobacco blend and filter performance so that the mainstream product — the smoke which enters the smoker’s mouth— has acceptable flavor characteristics.
Ex. 525 (emphasis added).
The plaintiff claimed and Lorillard agreed, as far back as its 1963 report, that “(i)n a filter cigarette, the quantity of tar, nicotine and phenol in the mainstream smoke is ... a function principally of the design and efficiency of the filter.” (Ex 280, 525.)
Lorillard made over the years numerous design decisions concerning its Newport cigarettes. The choices Lorillard made concerned:
1. The filler type, such as the use of proportion of “Bright” tobacco, “oriental” tobacco and “Burly” tobacco, all of which have different properties affecting cigarette smoke;
2. The overall weight of the cigarette, the properties of the paper utilized, various chemicals additives, the “cut”-size of the filler material, the coating on the paper, the inclusion and placement of ventilation holes on the cigarette, the inclusion and design of a filter, the use of “reconstituted” tobacco, and the use of “expanded” tobacco.
These and other design choices affect the nicotine content as well as the tar and particulate matter content of the smoke the cigarettes produced.
Safer alternative designs to those used for Newport cigarettes have been known to this Defendant for decades, are feasible, available, and can be sold commercially. While there is no totally “safe” cigarette, safer commercial brands which have been designed and marketed for years include Quest, Carleton and Now. Defendant intentionally declined to market a safe or even a safer cigarette.
Even though a filter was and is capable of removing 100% of the tar and particulate matter of cigarette smoke, Lorillard never included this design element in its Newport cigarettes. Lorillard intentionally advanced flavorful smoke ahead of decreasing the tar and particulate matter of cigarette smoke from Newport cigarettes. Using such a filter would not change Newport cigarettes in a way that would prevent Lorillard from selling them commercially.
There would be no significant additional cost to Lorillard to manufacture cigarettes with the safer alternative designs, as the means to manufacture them are within the realm of normal cigarette-making technology. I accept that Lorillard’s failure to produce a low tar/low nicotine and/or filter Newport cigarette more likely than not caused Ms. Evans to die from small cell lung cancer in 2004. Marie Evans would have benefitted if Lorillard had employed such a filter capable of removing 100% of the tar and particulate matter of cigarette smoke.
Plaintiff served Defendant his second 93A demand letter on March 23, 2004; this letter conformed to the requirements of 93A. This letter sufficiently described the specific acts and practices that Plaintiff alleged violated Section 2 of Chapter 93A. By the time of trial, Plaintiff had narrowed his claims, all of which were reasonably described in this letter.
Plaintiffs demand letter made clear that the damages being sought were those under the Wrongful Death Statute (G.L.c. 229): the damages recoverable for Marie Evans’s wrongful death under Section 2, her conscious pain and suffering under Section 6, her funeral and burial expenses and her son’s loss of her consortium. Defendant timely responded to plaintiffs c. 93A demand letter on April 24, 2004, declining to make any offer as, in its opinion, liability was not then reasonably clear. Lorillard never made any settlement offer to Plaintiff.
The Florida Supreme Court in Engle v. Liggett Group, Inc., 945 So.2d 1246 (2006), and the United States Court of Appeals for the D.C. Circuit in United States v. Philip Morris USA, Inc., 449 F.Sup.2d 1 (D.D.C. 2006), aff'd in part rev’d in part 566 F.3d 1095 (D.C. Cir. 2009), cert. denied sub north, Lorillard Tobacco Company v. United States, 130 S.Ct. 3502 (June 10, 2010), upheld jury findings that misconduct by Lorillard caused harm to the plaintiffs in those lawsuits. Many of the issues resolved by those decisions are the same as those in this case.
As a defendant in Engle and in Philip Morris, Lorillard had an opportunity and incentive to defend allegations that its products are defective and that they harmed consumers like Marie Evans. Lorillard is bound here by the findings in both of the earlier cases.[8]
*215 I accept the Plaintiffs’ argument that the findings in Engle and Philip Morris furnish an independent basis for liability in this case.
This Court adopts the following findings in Engle:[9]
a. Smoking cigarettes causes lung cancer (specifically, adenocarinoma, large cell carcinoma, small cell carcinoma, and squamous cell carcinoma).
b. Nicotine in cigarettes is addictive.
c. Lorillard placed cigarettes on the market that were defective and unreasonably dangerous.
d. Lorillard sold or supplied cigarettes that were defective.
e. Lorillard concealed or omitted material information not otherwise known or available to the public knowing that was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.
f. Lorillard concealed or omitted information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment.
This Court adopts the following findings in Philip Morris:[10]
a. “Cigarette smoking causes disease, suffering, and death. Despite internal recognition of this fact, [Lorillard] ha[s] publicly denied, distorted, and minimized the hazards of smoking for decades. The scientific and medical community’s knowledge of the relationship of smoking and disease evolved through the 1950s and achieved consensus in 1964. However, even after 1964, [Lorillard] continued to deny both the existence of such consensus and the overwhelming evidence on which it was based.” See finding No. 509 of Ex. 1035 for identification.
b. “Cigarette smoking causes lung cancer . .. Lung cancer kills 160,000 Americans each year, and 90% of all lung cancer cases are caused by cigarette smoking. The five-year survival rate for lung cancer is only 14%” ... Id. at No. 512.
c. “By at least January 1964, with the issuance of the Surgeon General’s 1964 Report, [Lorillard] knew there was a consensus in the scientific community that smoking caused lung cancer and other diseases. Despite that fact, [it] publicly insisted that there was a scientific controversy and disputed scientific findings linking smoking and disease knowing [its] assertions [was] false.” Id. at No. 664.
d. “[Lorillard] also continued to insist publicly that there was no need to undertake research to develop ‘safer’ cigarettes, since [it] asserted that the cigarettes then being sold were not harmful to health . . .” Id. at No. 755.
e. “[Lorillard] ha[s] been aware since the late 1950s of substantial evidence demonstrating that smoking causes significant adverse health effects, in particular, lung cancer.” Id. at No. 882.
f. “From at least 1953 until at least 2000, [Lorillard] repeatedly, consistently, vigorously— and falsely — denied the existence of any adverse health effects from smoking. Moreover, [it] mounted a coordinated, well-financed, sophisticated public relations campaign to attack and distort the scientific evidence demonstrating the relationship between smoking and disease, claiming that the link between the two was still an ‘open question.’ Finally, in doing so, [it] ignored the massive documentation in [its] internal corporate files from [its] own scientists, executives, and public relations people that . . . there was ‘little basis for disputing the findings [of the 1964 Surgeon General’s Report] at this time.’ ” Id. at No. 824.
g. “More than forty years after [Lorillard and others] issued the Frank Statement and created TIRC, [Lorillard’s] essential position on the relationship of smoking and health remains virtually unchanged. In April 1994, in the now-famous congressional hearings before the United States House of Representatives’ Subcommittee on Heath and the Environment, [Lorillard] executives asserted yet again that the causal relationship of smoking and cancer had not been proven: the CEOs of . . . Lorillard . . . publicly denied that smoking caused cancer.” Id. at No. 796.
h. “The statements of the CEOs were restatements of positions the companies continued to take publicly and uniformly at that time.” Id. at No. 797.
i. “As of the early 1990s, Lorillard’s position on causation was: Lorillard does not and will not authorize the use of the Risk Factor formulation for causation for public relations purposes. We wish to maintain the traditional articulation: unproven, statistical, lack of mechanism. Risk Factor discussion is for scientists only and only in the courtroom and its controlled circumstances.” Id. at No. 802.
j. “As late as 2004, Lorillard CEO Martin Orlowsky refused to admit the full extent of smoking’s harm. He was specifically asked: ‘Why hasn’t Lorillard specifically stated publicly that smoking causes any diseases other than smoking [sic] emphysema, COPD or heart disease?’ He responded: ‘We have — in certain instances, we do not know if in fact the evidence, the scientific evidence is such that it warrants saying it does cause. However, Lorillard’s longstanding position, as long as I’ve been with the company, is that certainly smoking can, and is a risk factor for those diseases.’ ” Id. at No. 815.
*216 k. “For more than forty years after issuance of the Frank Statement in 1954, and for more than thirty years after issuance of the Surgeon General’s first Report on smoking and health, [Lorillard] maintained [its] position denying the causal relationship between smoking and disease.” Id. at No. 826.
l. “Since the 1950s, [Lorillard] ha[s] researched and recognized, decades before the scientific community did, that nicotine is an addictive drug, that cigarette manufacturers are in the drug business, and that cigarettes are drug delivery devices. The physiological impact of nicotine explains in large part why people use tobacco products and find it so difficult to stop using them. Moreover, [Lorillard] ha[s] sought to exploit the addictive quality of smoking and nicotine for decades in order to develop new products and increase sales.” Id. at No. 829.
m. ‘The wealth of documentary evidence... reveals that for decades [Lorillard] knew and internally acknowledged that nicotine is an addictive drug, that cigarettes are a nicotine delivery device, and that addiction can be enhanced and perpetuated through manipulating both the amount of nicotine and the method of nicotine delivery. Much of [Lorillard’s] knowledge of nicotine was obtained from in-house and industry-funded research into the pharmacological effects of the drug.” Id. at No. 882.
n. “Lorillard researchers accepted the scientific consensus in the 1970s that ‘the most probable reason for the addictive properties of the smoke is the nicotine.’ ” Id. at No. 883.
o. “Lorillard knew that nicotine was distinct from and not essential to the taste of a cigarette. In a March 2, 1976 presentation, the Will Graham Company advised Lorillard that ‘the taste of tobacco may be one of the least significant reasons why a person smokes,’ adding that, ‘it certainly ranks well below the impact of nicotine’ for smokers.” Id. at No. 1124.
p. “In a February 13, 1980 Lorillard memorandum stamped ‘SECRET,’ marketing vice president Smith described the goal of the ongoing Lorillard nicotine research project called the ‘RT Information Task Force.’ The memorandum provided Lorillard executives, including Dr. Spears, details of the secret project:
‘Goal-determine the minimum level of nicotine that will allow continued smoking.’
‘We hypothesize that below some veiy low nicotine level, diminished physiological satisfaction cannot be compensated for by psychological satisfaction. At this point smokers will quit, or return to higher T & N [tar and nicotine] brands.’ “
Id. at No. 1130.
q. “[Lorillard’s] internal documents reflect a sophisticated understanding of nicotine and its role in creating smoking addiction — an understanding that is totally inconsistent with their longstanding public denials that nicotine is addictive. In addition, it is clear that [Lorillard] intentionally withheld from public dissemination, from the public health community, and from government authorities, accurate and important information regarding the
r. “[Lorillard] suppressed [its] own extensive research findings . . . supporting the conclusion that nicotine is addictive, and fostered controversy about the extent of scientific knowledge concerning nicotine and its addictive effects that was publicly available.” Id. at No. 1267.
s. “For approximately forty years, [Lorillard] publicly, vehemently, and repeatedly denied the addictiveness of smoking and nicotine’s central role in smoking. [Lorillard] made these denials out of fear that public acknowledgment of what was so well documented and widely accepted internally within their corporate offices and scientific laboratories could result in governmental (i.e., FDA) regulation, adverse liability judgments from addicted smokers suffering the adverse health effects of smoking, loss of social acceptability of smoking, and the ultimate loss of corporate profits. The evidence spelled out above is simply overwhelming that [Lorillard] knew that smoking is addictive and knew that nicotine is the agent creating and sustaining that addiction. There is also overwhelming evidence that even though [Lorillard] ha[s] known internally about addiction for decades, [it] has endeavored to keep the extensive research and data they had accumulated out of the public domain and out of the hands of the public health community by denying that such data existed, by refusing to disclose it, and by shutting down or censoring laboratories and research projects which were investigating the mechanisms of nicotine.” Id. at No. 1359.
t. “[Lorillard] asserts that the public health community and the public itself has known for decades that nicotine produced dependence. For example, [Lorillard] cite to the 1962 publication of the well respected Larson, Haag and Silvette compendium, Tobacco Experimental and Clinical Studies, which described nicotine’s effects on the human nervous system and summarized existing research suggesting that people smoke to obtain nicotine, that nicotine has pharmacological effects, and that nicotine is addictive or habituating . . . [Lorillard] also cite to the United States Supreme Court comment that, when Congress enacted the Federal Cigarette Labeling Act in 1965, ‘the adverse health consequences of tobacco were well known, as were nicotine’s pharmacological *217 effects.’ . . . Even if there is truth to [Lorillard’s] speculation that ‘everyone knew’ of nicotine’s addictiveness, there is no question that the public health community lacked the substantial and sophisticated understanding of nicotine’s effects and role that [Lorillard] possessed. Put quite simply, if the Surgeon General of the United States possessed the information and data [Lorillard] possessed prior to publication of his 1964 Report, it is simply not possible that he would have ignored it.” Id. at No. 1360.
u. “Moreover, there is a basic inconsistency in [Lorillard’s] position. If, in fact, ’’everybody knew" that smoking and nicotine were addictive, then why were Defendants publicly, vehemently, and repeatedly denying it?" Id., at No. 1361.
v. “[Lorillard’s] denials misled the public about why quitting smoking is so difficult, exactly how difficult it is, and about why failure to quit is not simply a function of personal weakness or lack of willpower. In short, after reassuring the smoker that smoking was not bad for her health, and was not addictive, [Lorillard] then blamed her for being unable to stop using the product [it] had so successfully marketed with false information.” Id. at No. 1362.
w. “[Lorillard] ha[s] long known that nicotine creates and sustains an addiction to smoking and that cigarette sales, and ultimately tobacco company profits, depend on creating and sustaining that addiction. Given the importance of nicotine to the ultimate financial health of [Lorillard], [it] ha[s] undertaken extensive research into how nicotine operates within the human body and how the physical and chemical design parameters of cigarettes influence the delivery of nicotine to smokers. Using the knowledge produced by that research, [Lorillard] ha[s] designed their cigarettes to precisely control nicotine delivery levels and provide doses of nicotine sufficient to create and sustain addiction. At the same time, [Lorillard] ha[s] concealed much of their nicotine-related research, and have continuously and vigorously denied [its] efforts to control nicotine levels and delivery.” Id. at No. 1366.
x. “The typical cigarette contains far more nicotine than an individual will inhale as he or she smokes. Every aspect of a cigarette is precisely tailored to ensure that a cigarette smoker can pick up virtually any cigarette on the market and obtain an addictive dose of nicotine. Most cigarettes are manufactured using reconstituted tobacco material, additives, bum accelerants, ash conditioners, and buffering substances, all of which affect nicotine levels and delivery. Other cigarette design features used by [Lorillard] to control nicotine delivery include filter design, paper selection and perforation, ventilation holes, leaf blending, and use of additives (such as ammonia) to control the pH of cigarette smoke.” Id. at No. 1368.
y. “Nicotine delivery levels are not a matter of random variation. Rather, cigarettes are specifically designed to deliver a range of nicotine doses so that a smoker can obtain her optimal dose from virtually any cigarette on the market, regardless of that cigarette’s nicotine delivery level as measured by the FTC method.” Id. at No. 1508.
z. Lorillard “set out to design commercial cigarettes that were capable of delivering nicotine across a range of doses that would keep smokers addicted.” Id. at No. 1514.
aa. “On April 14, 1994, Alexander Spears, then Vice Chairman and Chief Operating Officer of Lorillard, confirmed in testimony before Congress that cigarette makers could adjust the level of nicotine in their products by blending different types of tobacco to create a blend with a higher nicotine concentration.” Id. at No. 1569.
bb. “Despite the overwhelming evidence of their research into and utilization of methods to control the amount and delivery of nicotine in cigarettes, [Lorillard] ha[s] denied, repeatedly and publicly, that [it] manipulate[s] nicotine content and delivery in cigarettes in order to create and sustain addiction.” 7d. at No. 1705.
cc. Lorillard has “repeatedly made vigorous and impassioned public denials — before Congressional committees, in advertisements in the national print media, and on television — that neither smoking nor nicotine is addictive, and that [it] do[es] not manipulate, alter, or control the amount of nicotine contained in the cigarettes they manufacture. The Findings of Fact . . . provide overwhelming evidence that those statements are false.” Id. at No. 1758.
dd. “[Lorillard] researched, developed, and implemented many different methods and processes to control the delivery and absorption of the optimum amount of nicotine which would create and sustain smokers’ addiction.” Id. at No. 1759.
ee. “[T]he evidence ... is overwhelming that [Lorillard] ha[s], over the course of many years, time and again — and with great self-righteousness — denied that [it] manipulated the nicotine in cigarettes so as to increase the addiction and dependence of smokers. Those denials were false.” Id. at No. 1763.
ff. “[F]or several decades, [Lorillard] ha[s] falsely denied that [its] marketing efforts target young people. [Lorillard] falsely claimfs] that all of [its] marketing is aimed only at encouraging the brand loyalty of adult smokers. [Lorillard] also falsely states that marketing has no effect on youth initiation and smoking behavior.” Id. at No. 3206.
*218 gg. “Lorillard has also made numerous false and misleading statements about youth smoking and marketing. In a January 6, 1970 letter to Michael Pertschuk, General Counsel for the United States Senate Commerce Committee, Arthur Stevens, Lorillard General Counsel, stated: ‘It is Lorillard’s policy and practice to avoid directing its advertising or promotions toward young people.’ ” Id. at No. 3257.
hh. “The evidence is clear and convincing — and beyond any reasonable doubt — that [Lorillard] ha[s] marketed to young people twenty-one and under while consistently, publicly, and falsely, denying they do so.” Id. at No. 3296.
ii. “In fact, the overwhelming evidence . . . prove[s] that, historically, as well as currently, [Lorillard] do[es] market to young people, including those under twenty-one, as well as those under eighteen. [Lorillard’s] marketing activities are intended to bring new, young, and hopefully long-lived smokers into the market in order to replace those who die (largely from tobacco-caused illnesses) or quit. [Lorillard] intensively researched and tracked young people’s attitudes, preferences, and habits. As a result of those investigations, [it] knew that youth were highly susceptible to marketing and advertising appeals, would underestimate the health risks and effects of smoking, would overestimate their ability to stop smoking, and were price sensitive. [Lorillard] used [its] knowledge of young people to create highly sophisticated and appealing marketing campaigns targeted to lure them into starting smoking and later becoming nicotine addicts ... As a result, 88% of youth smokers buy the three most heavily advertised brands — Marlboro, Camel, and Newport.” Id. at No. 3298.
jj. “The evidence is overwhelming that [Lorillard] intentionally exploit adolescents’ vulnerability to imagery by creating advertising that utilizes the themes of independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being ‘cool.’ [Lorillard] ha[s], over the years, placed this advertising in magazines, on billboards, at point of sale (or ‘POS,’ meaning marketing materials placed in retail locations such as convenience stores), and in other venues that historically and currently reach millions of teens.” Id. at No. 2674.
kk. “Initiation of smoking before the age of twenty-one is particularly harmful because, the earlier one begins smoking, the more likely one will become addicted, the less likely one will be able to quit, and the more likely one will develop a smoking-related disease.” Id. at No. 2702.
11. “Lorillard suppressed scientific research on smoking and health. In 1977, Alexander Spears of Lorillard told a scientist that he would not be permitted to deliver a research paper unless he deleted data from a study related to human smoking habits.” Id. at No. 3927.
I accept that Lorillard manipulates the levels of tar, nicotine, and menthol in Newport cigarettes, which eases initiation to smoking and often results in lifelong addicts with negative health consequences. The parties stipulated that Ms. Evans died of small cell lung cancer caused by smoking. Dr. William Farone testified that there are safer alternative designs to those that are used in Newport cigarettes and that these alternatives are feasible, albeit less profitable. Indeed, Lorillard acknowledged in the 1940s that it could design a filter to remove 100% of the tar and nicotine in cigarettes (Ex. 525), but it chose not to implement such a design because it knew the consequences of such actions — decreased sales. Instead, Lorillard conducted research to “enrich” the nicotine and to determine the level of nicotine necessary to keep its consumers hooked, as demonstrated in an internal memorandum: “Goal — Determine the minimum level of nicotine that will allow continued smoking,” and “below some very low nicotine level . . . smokers will quit.”
RULINGS OF LAW
Evans asserts that Lorillard violated c. 93A in three respects: 1) it breached the implied warranty of merchantability; 2) it breached a duty, which it voluntarily assumed, to research the health hazards of smoking and provide accurate information of the research to the public; and 3) it failed to make a reasonable settlement offer upon receiving Evans’s c. 93A demand letter. Additionally, Evans offers collateral estoppel as an independent basis for liability under c. 93A. This court will address each of these grounds in turn.
CHAPTER 93A
“Actionable c. 93A conduct must occur ‘in a business context.’ ” McGonagle v. Home Depot, U.S.A., Inc., 75 Mass.App.Ct. 593, 599 (2009), citing Lantner v. Carson, 374 Mass. 606, 611 (1978). It is undisputed that Lorillard, as the manufacturer and seller of Newport cigarettes, was engaged in “the conduct of [ ] trade or commerce” at all times material to the complaint. See G.L.c. 93A, §2(a). It is also undisputed that Evans filed a proper and timely demand letter under c. 93A, §9.[11]
General Laws c. 93A, §2(a) makes unlawful “unfair or deceptive acts or practices in the conduct of any trade or commerce!.]” A private individual “who has been injured by another person’s use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder” may bring suit in superior court for damages or equitable relief, or both. Id. at §9(1); see Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. 671 (1983) (discussing the broad availability *219 of relief under §9). “Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact. . . the boundaries of what may qualify for consideration as a [G.L.c.] 93A violation is a question of law.” Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390, 414 (1991), S.C., 412 Mass. 703 (1992) (citations omitted). “Courts have deliberately avoided setting down a clear definition of conduct constituting a violation of G.L.c. 93A." Spence v. Boston Edison Co., 390 Mass. 604, 616 (1983).
Generally, a “practice or act will be unfair under G.L.c. 93A, §2, if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness: (2) immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury!.]” Morrison v. Toys “R" Us, Inc., 441 Mass. 451, 457 (2004), quoting Heller Fin. v. Insurance Co. of N. Am., 410 Mass. 400, 408 (1991). In deciding whether a certain practice is “unfair” under G.L.c. 93A, “the nature of [the] challenged conduct and the purpose and effect of that conduct [are] the crucial factors!.]” Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 42-43 (1995).
The Supreme Judicial Court has stated that a practice is “deceptive,” “if it ‘could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.’ ” Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 777 (1980), quoting Lowell Gas Co. v. Attorney Gen., 377 Mass. 37, 51 (1979). The Supreme Judicial Court has also stated that conduct is deceptive if it possesses “a tendency to deceive." Leardi v. Brown, 394 Mass. 151, 156 (1985), quoting Trans World Accounts, Inc. v. Federal Trade Comm’n, 594 F.2d 212, 214 (9th Cir. 1979). “In determining whether an act or practice is deceptive, ‘regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which it might reasonably be expected to have [on the alleged injured party].’ ” Leardi, 394 Mass. at 156, quoting P. Lorillard Co. v. FTC, 186 F.2d 52, 58 (4th Cir. 1950). Further, “technicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice." Leardi, 394 Mass. at 159, quoting Baldassari v. Public Fin. Trust, 369 Mass. 33, 41 (1975). A successful c. 93A action based on deceptive acts or practices does not require proof that a plaintiff relied on the representation, see Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703 (1975), or that the defendant intended to deceive the plaintiff, see Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1983), or even knowledge on the part of the defendant that the representation was false. See Slaney, 366 Mass. at 703.
To recover under c. 93A, the plaintiff must establish a causal connection between the unfair or deceptive practice and his loss. Hershenow v. Enterprise Rent-A-Car Co., 445 Mass. 790, 796 (2006). Causation exists where the alleged unfair or deceptive practice reasonably could be found to have induced the consumer to act differently than she would have acted in the absence of the representation. Id. at 801.
I. BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
This court will first consider whether Lorillard breached the implied warranty of merchantability. Evans argues that Lorillard’s Newport cigarettes designed, manufactured, marketed, and sold after 1979[12] were defective in that; (a) they contained addictive levels of nicotine; (b) the smoke contained unnecessarily high levels of carcinogens; and (c) they contained menthol. He alleges that these defects caused Ms. Evans’s cancer and death. Evans offered evidence at trial of a cigarette containing less nicotine and tar as a safer alternative design. Lorillard argues that Evans has failed to demonstrate: 1) that Newport cigarettes are unreasonably dangerous; 2) that they contain a unique design defect; and 3) a reasonable alternative design. It further argues that absent a showing of a unique design defect, the doctrine of conflict preemption bars Evans’s claim.
“The plaintiffs claim for breach of the implied warranty of merchantability is governed principally by G.L.c. 106, §2-314(2)(c ).” Haglund v. Philip Morris, Inc., 446 Mass. 741, 745-46 (2006). The Supreme Judicial Court in Haglund stated:
A seller breaches its warranty obligation when a product that is “defective and unreasonably dangerous,” for the “[ojrdinaiy purposes” for which it is “fit” causes injury. “Ordinary purposes” refers to a product’s intended and foreseeable uses. “Fitness” is a question of degree that primarily, although not exclusively, concerns reasonable consumer expectations. Both “ordinary purposes” and “fitness” are concepts that demand close attention to the actual environment in which the product is used. The plaintiff in a design liability warranty case must prove that, at the time he was injured, he was using the product in a manner that the defendant seller, manufacturer, or distributor reasonably could have foreseen.
Id. at 746-47 (internal quotations and citations omitted).
A plaintiff may premise his implied warranty of merchantability claim on either the defendant’s failure to warn or defective design. Id. at 747. “A product... is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller . . . and the omission of the alternative design renders the product not reasonably safe[.]” Restatement (Third) of Torts: Products Liability §2(b); see also Back v. *220 Wickes Corp., 375 Mass. 633, 640 (1978) (“The Legislature has made the Massachusetts law of warranty congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts §402A (1965)”).[13] In this case, Evans claims that Lorillard violated c. 93A by both failing to warn and defectively designing the Newport cigarettes.
Unreasonably Dangerous
In Haglund v. Philip Morris, Inc., the Supreme Judicial Court specifically held that cigarette use is unreasonably dangerous. 446 Mass. 741, 743 (2006) (“[Qigarette smoking is inherently dangerous and [ ] there is no such thing as a safe cigarette. Because no cigarette can be safely used for its ordinary purpose, smoking, there can -be no nonunreasonable use of cigarettes”).
It is telling that Lorillard does not cite Haglund, a directly on-point controlling case, anywhere in its' briefs. In any event, the issue remaining is whether the unreasonableness here results from the presence of a design defect in Newport cigarettes, which Evans must establish by proving the existence of a reasonable alternative design. See id. at 753. If Evans establishes a defective design, he must also prove that the design defect caused his mother’s harm.
Unique Defect
Given that all cigarettes contain nicotine, Lorillard argues that Evans fails to identify a unique defect in Newport cigarettes. In Haglund v. Philip Morris, Inc., 2009 Mass.Super. LEXIS 285 (Mass.Super. 2009) [25 Mass. L. Rptr. 205],[14] the defendant cigarette company made an identical argument, and this court finds Judge Henry’s decision instructive. Relying on Kyte v. Philip Morris, Inc., 408 Mass. 162 (1990), Judge Henry concluded that this argument mis characterizes the plaintiffs burden. In both Haglund and Kyte, the defendant cigarette company viewed “the plaintiffs’ warranty claims [as] . . . based on the theory that the sale of standard, everyday cigarettes violates the implied warranty of merchantability.” Kyte, 408 Mass. at 172. However, the Supreme Judicial Court in Kyte rejected this characterization, instead adopting the plaintiffs’ view “that, because of their defective design, [the defendant’s] . . . cigarettes were inherently carcinogenic and addictive,” id. at 171, and thus, the plaintiffs’ design defect claims were proper because they “rel[ied] on a defect or defects specific to [the defendant’s] . . . cigarettes, and not on a claim that all cigarettes are bad.” Id. at 172.
The same logic applies here. Just as in Haglund and Kyte, Evans’s claim against Lorillard is specific to Newport cigarettes: Lorillard breached the implied warranty of merchantability because Newport cigarettes contain a design defect, i.e., nicotine, that harmed the decedent. See Haglund, 2009 Mass.Super. LEXIS 285, at *16-*17. Therefore, Evans set forth a claim particular to Lorillard’s Newportcigarettes.
Evans offered evidence at trial, including Dr. Farone’s expert testimony, that since at least 1979, Lorillard has continuously intentionally manipulated the ingredients, including nicotine and tar levels, and construction of its cigarettes, including Newports, to create and maintain addiction in smokers. The evidence showed that Lorillard did so despite knowing the smoking-related health risks to its consumers. Moreover, although no evidence was offered that the addition of menthol makes Newport cigarettes any more addictive, its effects on making smoke inhalation smoother increases consumption and therefore addiction among smokers. However based on my findings concerning the defendant’s manipulation of nicotine and the carcinogenicity of cigarettes, including New-ports, I conclude that Newport cigarettes contain at least two design defects, and it is not necessary for this court to determine whether the addition of menthol is another design defect.
. Safer Alternative Design
Evans’s proposed alternative design is a cigarette containing substantially less nicotine and tar. Lorillard argues that such a cigarette is no longer a cigarette and also would not be commercially feasible.
With respect to the plaintiffs alternative design burden, “[t]he plaintiff need only convince the jury that a safer alternative design was feasible, not that any manufacturer in the industry employed it or even contemplated it.” Haglund, 446 Mass. at 748. In “determin[ing] the adequacy of a product’s design the jury must weigh multiple factors, including . . . ‘the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.’ ” Haglund, 446 Mass. at 748, quoting Back, 375 Mass. at 642. In resolving these issues, “the balance struck by the jury is ultimately a judgment about the ‘social acceptability’ of the design.” Id., quoting Back, 375 Mass. at 642.
Judge Henry in Haglund specifically addressed the argument that a de-nicotined cigarette would no longer be a cigarette, following the reasoning in Kimball v. R.J. Reynolds Tobacco Co., 2006 U.S.Dist. LEXIS 27138 (W.D.Wash. 2006). There, the defendant cigarette manufacturer made the same argument, even using the same analogy as Lorillard regarding adding two wheels to a motorcycle. The Kimball court and Judge Henry concluded that whether an alternative cigarette can perform as a cigarette and its feasibility are issues for the jury to decide. Haglund, 2009 Mass.Super. LEXIS 285, at *36-*38 (“These issues are for jurors to resolve as they balance the social acceptability of [the defendant’s] cigarettes as they are designed against the alternative cigarette, taking into consideration *221 not only the undue cost to [the defendant] as a result of potentially lowered demand for a cigarette with nicotine extracted to below 0.06 milligrams, but also whether it can perform as a cigarette").
In this case, Evans presented evidence, including Dr. Farone’s expert testimony, that not only is it possible to create a cigarette with lower levels of tar and nicotine than Newport cigarettes, but three such cigarettes have been commercially available for many years. Evans also presented evidence showing that such alternative designs would remain cost effective and marketable. Lorillard made the same arguments at trial that such a cigarette would not be a cigarette and was not commercially viable. However, the jury was not persuaded and nor is this court. The jury concluded, as does this court, that a reasonable safer alternative existed which is also commercially feasible.
Lorillard does not contest the causation element[15] of Evans’s breach of implied warranty claim in its brief. Nevertheless, I note that the jury concluded smoking Lorillard’s Newport cigarettes was a substantial factor in causing Ms. Evans’s lung cancer. I reach the same conclusion.
Based on my Findings of Fact and the cited cases, I reach the same conclusion as the jury in finding that Lorillard breached the implied warranty of merchantability because the Newport cigarettes it sold to Ms. Evans were defective and unreasonably dangerous.[16]
Conflict Preemption
Given that Lorillard’s conflict preemption argument was premised on the lack of a design defect in its Newport cigarettes, this court, having determined such a design defect to exist, need not address conflict preemption. In any event, this court notes that such an argument would fail as a matter of law. See Haglund, 2009 LEXIS 285, at *38-*48.
Application to C. 93A
Given Evans’s claim, it is necessary to determine whether Lorillard, having made and marketed Newport cigarettes with design defects, violated c. 93A in breaching the implied warranty of merchantability. Lorillard argues that a breach of the implied warranty of merchantability, absent negligence, does not necessarily result in a violation of c. 93A. However, this argument is inapposite because Lorillard was negligent and grossly negligent in this case.
In Maillet v. ATF-Davidson Co., the Supreme Judicial Court noted that “ [generally, a breach of warranty constitutes a violation of G.L.c. 93A, §2.” 407 Mass. 185, 193 (1990) (and cases cited). In addition, “(t)he Attorney General, pursuant to G.L.c. 93A, §2(c), has promulgated a regulation providing that ‘[i]t shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligations arising under a warranty.’ 940 Code Mass. Regs. §3.08(2) (1986). The regulations specifically include the implied warranty of merchantability under the definition of ‘warranty.’ 940 Code Mass. Regs. §3.01 (1986).” Id. Like Lorillard, the Maillet defendant argued that “in a products liability case, a nonnegligent breach of warranty should not fall under the general rule.” Id. at 190. The Maillet court, however, did not reach the issue of whether liability under c. 93A should be automatically imposed against a nonnegligent defendant for a breach of warranty because the jurors in that case concluded, and the trial judge agreed, that the defendant was negligent. Id. Accordingly, the Supreme Judicial Court determined that the defendant’s negligence combined with its breach of warranty constituted a violation of G.L.c. 93A, §2.
Here, Lorillard was negligent. As stated on the special verdict form, the jury determined that Lorillard was negligent in the design, marketing, and/or distribution of Newport cigarettes.[17] Moreover, the jury also determined that Lorillard was grossly negligent and acted in a manner that was malicious, willful, wanton or reckless. Based on my Findings of Fact, I reach the same conclusions. Thus, as in Maillet, the jurors concluded, and this court agrees, that the defendant was both negligent and grossly negligent and breached the implied warranty of merchantability. Lorillard’s negligence and breach directly contributed to Ms. Evans’s addiction to and continuous smoking which ultimately led to her development of lung cancer and death. Accordingly, based on these grounds, Lorillard violated c. 93A for its breach of the implied warranty of merchantability.
II. BREACH OF A VOLUNTARILY ASSUMED DUTY AND APPLICATION TO C. 93A
Evans argues that Lorillard also violated c. 93A because it voluntarily assumed and breached a duty to research the health hazards of smoking cigarettes and to provide accurate information regarding that research to its consumers including Ms. Evans. Lorillard makes several procedural arguments and contends that Evans cannot prove the underlying breach of a voluntarily assumed duty claim. Lorillard also argues that it cannot be liable for the acts of industry organizations of which it was a member; that the breach of a voluntarily assumed duty claim is preempted by the Labeling Act; and that the claim is barred by the Noerr-Pennington Doctrine and the First Amendment.
Lorillard first contends that Evans should be precluded from arguing that it violated c. 93A on the ground that it breached a voluntarily assumed duty because Evans failed to allege it in his complaint. This is incorrect. Evans’s c. 93A claim, count VI of the complaint, consisted of Paragraphs 76-81. Lorillard correctly states in its brief that Paragraph 77 refers to his fraud and misrepresentation claim (count I) and his breach of warranty claim (count III).
*222 Lorillard conveniently fails to mention that Paragraph 78 of Evans’s complaint provides additional grounds for violation of c. 93A. This Paragraph states:
78. Lorillard’s misrepresentations and failures to disclose include without limitation:
a. Lorillard’s misleading and deceptive statements and practices relating to the issue of smoking and health, including intentional misrepresentations that there is no proof of a causal connection between cigarette smoking and adverse health effects and that cigarette smoking is not addictive;
b. Lorillard’s misleading and deceptive statements and practices relating to its false promise to conduct and disclose objective research on the issue of smoking and health; and
c. Lorillard’s concealment of information relating to the issue of smoking and health and failure to disclose material facts, including intentional concealment and failure to disclose.
Both Paragraphs 77 and 78 address the underlying facts of Lorillard’s so-called “campaign of deceit and deception” (“the campaign”). However, whereas Paragraph 77 relates to counts I and III, Paragraph 78 relates to count II, Evans’s voluntary undertaking of duty claim. Evans clearly alleged in his complaint breach of a voluntarily assumed duty as a basis for his c. 93A claim.
Lorillard next argues that Troy, J. and Giles, J. in their respective decisions on Lorillard’s motion to dismiss [22 Mass. L. Rptr. 91] and motion for summary judgment limited Evans’s c. 93A claim by precluding the voluntary undertaking of duty claim as a basis. Lorillard’s claim is incorrect. Neither Troy, J. nor Giles, J. ever, as Lorillard suggests, “recognized that the 93A claim was limited to Plaintiffs allegations of (1) fraud and misrepresentation and (2) warranty-based design defect.” In his motion to dismiss memorandum, Troy, J. agreed “that Count VI is based on conduct alleged in Counts I and III” (emphasis added). He merely recognized that count VI is based on the facts relating to the campaign, the same facts which also form the basis of counts I and III; his decision did not limit the scope of count VI nor exclude count II as a basis. Giles, J. in her summary judgment memorandum, after granting Lorillard summary judgment on count I, allowed Evans to proceed with his c. 93A claim “on all bases except his claim of fraud and misrepresentation.” Although she did limit the scope of count VI by precluding count I as a basis, she did not preclude count II or the campaign’s underlying facts. Indeed, these remain proper bases for Evans’s c. 93A claim.
Lorillard also argues that Evans cannot prove the elements of the underlying breach of a voluntarily assumed duty claim. Massachusetts recognizes that “a duty voluntarily assumed must be performed with due care,” and the Supreme Judicial Court has approved the principles pertaining to voluntary assumption of a duty as set forth in the Restatement (Second) of Torts §323 (1965).[18] Mullins v. Pine Manor College, 389 Mass. 47, 52, 53 (1983). “If a person voluntarily assumes a duty or undertakes to render services to another that should have been seen as necessary for her protection, that person may be liable for harm caused because of the negligent performance of his undertaking.” Thorson v. Mandell, 402 Mass. 744, 748 (1988). Defining the scope of the duty assumed is a fact-specific inquiry. Cottam v. CVS Pharmacy, 436 Mass. 316, 324 (2002). It must also be shown “that either (a) the failure to exercise due care increased the risk of harm, or (b) the harm is suffered because of [Ms. Evans’s] reliance on the undertaking.” Mullins, 389 at 53-54.
Lorillard makes three main arguments regarding the elements of Evans’s c. 93A claim that Lorillard breached a voluntarily assumed duly: (1) that the 1954 Frank Statement cannot form the basis of Evans’s c. 93A claim because the advertisement ran for only a single day before the effective date of the October 18, 1978 amendment to c. 93A, §9; (2) that Evans must, and cannot, prove that Lorillard was grossly negligent because any duty it assumed regarding Ms. Evans was gratuitous; and (3) that Evans cannot prove causation.
Lorillard offers no authority to support its first argument. In any event, the scope of the duty assumed is a fact-specific inquiry. Cottam, 436 Mass. at 324. As Giles, J. noted, a fact-finder could determine that the text of the Frank Statement suggested that tobacco companies undertook long-term research and disclosure duties, extending the scope of Lorillard’s duty to those people who began smoking after its publication. Through the Frank Statement, Lorillard voluntarily accepted a continuous and ongoing duly, which extended through and past 1979, to research the health hazards of smoking and to disclose accurate information regarding the results of that research.
In its second argument, Lorillard contends that, at most, its Frank Statement was a purely gratuitous undertaking such that it could not be liable absent gross negligence, which must be based on conduct amounting to an aggravated degree of culpability. Bagley v. Burkholder, 337 Mass. 246, 248 (1958). However, it is clear that Lorillard’s undertaking was not gratuitous. “To impose liability for ordinary negligence, it is only necessary for a (judge or] jury to find some business advantage to the defendant.” Beaulieu v. Lincoln Rides, Inc., 328 Mass. 427, 429 (1952) (advertising business purpose of, and benefit to, owner of amusement device in giving nonpaying customer free ride allowed customer to recover from owner of device for injury upon showing ordinary negligence). In issuing the Frank Statement, *223 Lorillard wasfurtheringitsbusinessinterests, seeking to ensure continued consumption of its cigarettes among its consumers by representing that it was “accepting] an interest in people’s health as a basic responsibility” and assuring them that it would “aid and assist! ] .. . the research effort into all phases of tobacco use and health.” As such, Evans need only prove that Lorillard was liable for ordinary negligence in carrying out its assumed duty. In any event, the evidence in this case warrants not only a finding of ordinarynegligence, butoneofgrossnegligence; thus, even if Lorillard assumed merely a gratuitous duty, its conduct renders it liable. Evidence at trial revealed thatafter 1979, Lorillard possessed substantial information from its research of serious smoking-related health risks. However, not only did Lorillard choose to notdisclosethisinformation.itcontinued to represent to the public through at least 1994 that cigarette smoking did not cause lung cancer and/or that there was a genuine scientific debate on the issue, when there was not. For more than a decade and a half post-1979 Lorillard knew from its own research and files that smoking was hazardous to the smoker’s health and caused cancer, but intentionally waged a campaign of deceit and deception on the general public as to the harms caused by smoking. The juiy in its verdict specifically found that Lorillard was negligent in the performance of its assumed duty, and furthermore, that it was grossly negligent; this court reaches the same conclusion.[19] Lorillard was not only negligent, but grossly negligent, in failing to adequately research the health risks of smoking and especially negligent and grossly negligent in failing to disclose accurate information regarding such research to its consumers including Ms. Evans.
Lorillard’s third argument also fails. Evans must prove “that either (a) the failure to exercise due care increased the risk of harm, or (b) the harm is suffered because of [Ms. Evans’s] reliance on the undertaking.” Mullins, 389 Mass. at 53-54. A plaintiff need only show
that there was greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause. McLaughlin v. Berstein, 356 Mass. 219, 226 (1969). The plaintiffs are not required to eliminate entirely all possibility that the defendant’s conduct was not a cause. It is enough that they introduce evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. Restatement (Second) of Torts §433B, Comment b (1965).
Carey v. General Motors Corp., 377 Mass. 736, 740 (1979). Miles v. Tabor, 387 Mass. 783, 787 (1982). As Giles, J. accurately noted, Evans has submitted evidence tending to show that Lorillard’s course of conduct after the Frank Statement contributed to the confusion surrounding the health effects of smoking, which led Ms. Evans to disregard negative reports and to continue smoking. The evidence supports both a finding that Lorillard’s failure to exercise due care increased the risk ofharm and that Ms. Evans suffered harm after relying on Lorillard’s undertaking. Thejuiy specifically found that Lorillard’s breach of its voluntarily assumed duty was a substantial factor in causing Ms. Evans to develop lung cancer. This court is similarly satisfied that Evans has proven causation. Lorillard’s argument that Ms. Evans was aware of the health risks of smoking, for which the jury accounted by allotting 30% of negligence to Ms. Evans, has no bearing on the finding that Lorillard’s negligence caused Ms. Evans harm. See Carey, 377 Mass. at 740.
Lorillard’s remaining arguments are without merit. Lorillard was a member of the Counsel for Tobacco Research and the Tobacco Institute. In the Frank Statement, Lorillard pledged, among other things, financial aid to establish the Tobacco Industry Research Committee. Lorillard actively participated in supporting CTR and TI’s goal to “create! ] doubt about the health issue without actually denying it.” Ex. 67 dated May 1, 1972. These entities acted at least as Lorillard’s agents/representatives, and Lorillard is accordingly liable for their statements by which Lorillard sought and obtained benefit. Lorillard cannot discharge its own legal responsibilities merely by choosing to engage in public discourse through the shell of industry organizations without the potential for being liable for that discourse.
Lorillard’s preemption argument relies on the presumption that the voluntarily assumed duty claim “is nothing more than a disguised claim for failure to warn of the hazards of smoking.” However, Evans’s claim is legally distinguishable from the failure to warn claims preempted by the Labeling Act. The Labeling Act’s stated purposes are to inform the public of the health risks of smoking while protecting commerce and the economy from the ill effects of nonuniform requirements to the extent consistent with the first goal. The preemption provision, 15. U.S.C. §1334(b), provides that “[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes, the packages of which are labeled in conformity with the provisions of this chapter.” In Cipollone v. Liggett Group, Inc., 505 U.S. 504, 528-29 (1992), the plurality concluded that “the phrase ‘based on smoking and health’ fairly but narrowly construed” did not preempt the Cipollone plaintiffs common-law claim that cigarette manufacturers had fraudulently misrepresented and concealed a material fact, because the claim alleged a violation of a duty not to deceive — a duty that is not “based on” smoking and health. In Altria Group v. Good, 555 *224 U.S. 70 (2008), the plurality found the respondents’ allegations of a violation of the duty not to deceive as codified in the Maine Unfair Trade Practices Act, like the common-law duty in Cipollone, had nothing to do with smoking and health. The courts in both cases determined that such claims were not analogous to the “warning neutralization” claims preempted by the Labeling Act and were not preempted simply because they related to cigarette manufacturers and the labeling of its products. Similarly here, the Labeling Act does not bar Evans’s voluntarily assumed duly claim, which does not hinge on the sufficiency of the warning in Lorillard’s advertising, but rather on Lorillard’s violation of a duty it assumed, to adequately research and accurately disclose information about smoking-related health risks.
Lastly, Lorillard’s argument that Evans’s claim is barred by the Noerr-Pennington Doctrine and the First Amendment is inapposite. The Noerr-Pennington doctrine, a doctrine rooted in the Petition Clause of the First Amendment and generally applicable in the antitrust context, protects, “an attempt to persuade the legislature or the executive to take particular action with respect to a law[.]” Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 670 (1965).[20]The protection does not “cover activity that was not genuinely intended to influence government action.” Allied Tube & Conduit Corp. v. Indian Head, 486 U.S. 492, 508 n.10 (1998).
Neither Noerr-Pennington nor the First Amendment apply here. Even excepting Lorillard’s executive’s Congressional testimony, the Frank Statement and Lorillard’s advertisements and public statements were not attempts to influence the passage or enforcement of laws. Furthermore, the doctrine does not protect deliberately false or misleading statements. United States v. Philip Morris U.S.A., Inc., 566 F.3d 1095, 1123-24 (D.C.Cir. 2009), cert. denied sub nom., Lorillard Tobacco Co. v. U.S., 130 S.Ct. 3502 (June 28, 2010). Contrary to Lorillard’s assertions, Evans is not attempting to punish Lorillard for the content, in a First Amendment context, of its public statements. The First Amendment entitles Lorillard to state its opinions in public discourse, but does not shield it from liability for failing to perform its assumed obligations. Evans’s claim sounds in negligence. Lorillard assumed a voluntary duty, which it performed, not with due care, but with deceit. Neither the NoerrPennington doctrine nor the First Amendment provides a basis for barring Evans’s claim seeking to hold Lorillard accountable for its deceit.
Accordingly, Lorillard’s breach of its voluntarily assumed duty to research the health hazards of smoking and to accurately disclose such information to the public, basically its decades-long campaign of deceit and deception to the public constitutes a violation of c. 93A.
III. FAILURE TO MAKE A REASONABLE SETTLEMENT OFFER
At the December 7, 2010 hearing on the c. 93A claim, Evans alleged for the first time that Lorillard’s failure to make a reasonable monetary settlement offer constituted, in and of itself, a violation of c. 93A, §2. Because this allegation was not included in Evans’s complaint, this court need not and will not consider it as an independent ground for Lorillard’s violation of c. 93A.
Nevertheless, this court notes that Lorillard’s decision not to make a monetary settlement offer would not constitute a violation of c. 93A, §2. General Laws c. 93A, §9(3) allows a defendant/recipient of a c. 93A demand letter to respond with a written tender of settlement, which if determined by a court to be reasonable and rejected by the plaintiff, would limit the plaintiffs recovery to the amount tendered.[21] In all other cases, including if the defendant did not respond or offered an unreasonable tender or none at all, the plaintiff may recover multiple damages if the court finds that the violation of c. 93A, §2 was knowing and willful or that the refusal to grant relief upon demand was made in bad faith. Thus, a defendant’s conduct in response to a plaintiffs c. 93A demand letter is ordinarily not a violation of c. 93A, §2 in and of itself, but may determine whether the plaintiff is entitled to multiple damages. This court need not determine whether Lorillard acted knowingly and willfully or negotiated in bad faith for the reasons stated below.
Although c. 93A allows compensatory damages, and multiple damages for particularly egregious conduct,[22] such damages are foreclosed when they would amount to cumulative damages for the same injury. See Borne v. Haverhill Golf & Country Club, Inc., 58 Mass.App.Ct. 306, 327 (2003), rev. denied, 440 Mass. 1101 (2003); Canal Elec. Co. v. Westinghouse Elec. Corp., 406 Mass. 369, 379 n.10 (1990); McGrath v. Mishara, 386 Mass 74, 85 (1982). Evans’s c. 93A claim arises out of the same bundle of facts as those which underlay the jury’s verdict. The multiple damages factor, even if appropriate, has been satisfied by the punitive damages that were awarded in connection with the jury’s verdict. Here, a further award of damages would be duplicative;[23] however, the plaintiff is entitled to recover reasonable attorneys fees and costs pursuant to G.L.c. 93A, §9(4).[24] See id.
Accordingly, no additional damages are awarded pursuant to c. 93A, but Evans may submit an affidavit for costs and attorneys fees pursuant to the Order below.
IV. COLLATERAL ESTOPPEL
Through use of offensive collateral estoppel, Evans seeks this court to adopt certain findings by the Florida Supreme Court in Engle v. Liggett Group, Inc., 945 So.2d 1246 (2006), and the United States *225 Court of Appeals for the D.C. Circuit in United States v. Philip Morris USA, Inc., 449 F.Sup.2d 1 (D.D.C. 2006), aff'd in part, rev’d in part, 566 F.3d 1095 (D.C.Cir. 2009), cert. denied sub nom., Lorillard Tobacco Company v. United States, 130 S.Ct. 3502 (June 10, 2010), as an independent basis for liability in this case.[25] The courts in these two cases upheld jury findings that misconduct by Lorillard caused harm to the respective plaintiffs. Many of the issues resolved by those decisions are the same as those in this case.
Offensive collateral estoppel “occurs when a plaintiff seeks to prevent a defendant from litigating issues which the defendant has previously litigated unsuccessfully in an action against another party.” Bar Counsel v. Board of Bar Overseers, 420 Mass. 6, 9 (1995), quoting Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. 737, 744 (1985). See generally Pierce v. Morrison Mahoney LLP, 452 Mass. 718 (2008). “In appropriate circumstances . . . the offensive use of collateral estoppel is a generally accepted practice in American courts” and has been applied in Massachusetts." Commonwealth v. Two Parcels of Land, 48 Mass.App.Ct. 693, 697 (2000) (internal quotations omitted; and cases cited). The trial judge has “wide discretion in determining whether” applying offensive collateral estoppel is appropriate. Bar Counsel, 420 Mass. at 11.
Offensive collateral estoppel “does not require mutuality of parties, so long as there is an identity of issues, a finding adverse to the party against whom it is being asserted, and a judgment by a court or tribunal of competent jurisdiction.” Miles v. Aetna Cas. & Sur. Co., 412 Mass. 424, 427 (1992). “The central inquiiy then becomes whether the issue on which preclusion is sought has been ‘the product of full litigation and careful decision.’ ” Id., quoting Home Owners Fed. Sav. & Loan Ass’n v. Northwestern Fire & Marine Ins. Co., 354 Mass. 448, 455 (1968). “A defendant must also have [had] a ‘full and fair opportunity to litigate the issue in the first action.’ ” Matter of Goldstone, 445 Mass. 551, 559 (2005), quoting Matter of Cohen, 435 Mass. 7, 15 (2001).[26]
Ultimately, “[flaimess is the ‘decisive consideration’ in determining whether to apply offensive issue preclusion.” Id., quoting Matter of Cohen, 435 Mass. at 16. In determining fairness, “courts generally ask whether (1) the party in whose favor the estoppel would operate could have joined the original action, (2) the party against whom it would operate had an adequate incentive to defend the original action vigorously, (3) ‘the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant,’ and (4) ‘the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result.’ ” Haranb v. Board of Registration in Medicine, 398 Mass. 571, 577-78 (1986), quoting Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329-31 (1979).
Here, the use of the Engle and Philip Morris findings satisfies all of the specific requirements set out above. There was a final judgment against Lorillard in both cases, including opportunity for full appeals. There is every indication that the issues in those cases are identical to those raised in this case and Lorillard had a full and fair opportunity to litigate in both cases. Moreover, the circumstances satisfy fairness concerns. First, Evans obviously had neither a reason nor an opportunity to join the prior proceedings. Second, given the amount of money at stake and the fear of setting unfavorable precedent in tobacco litigation, Lorillard had every incentive to defend vigorously against the prior lawsuits. Third, although Lorillard has argued that prior to Engle and Philip Morris it frequently prevailed on the same issues on which it lost in those cases, it has not cited or provided any examples of such cases where it prevailed. Lastly, it has not been argued, nor does this court have any basis to decide, that a different result would have been forthcoming in this case due to any new procedural opportunities afforded Lorillard.
As such, the application of offensive collateral estoppel is fair, and this court adopts the findings in Engle and Philip Morris as an additional basis in support of its conclusions of law.
ORDER OF JUDGMENT
On the plaintiffs c. 93A claim, judgment is to enter for the plaintiff. Within 20 days plaintiff must submit to defendant his affidavit of reasonable attorneys fees and costs. Within 20 days of receipt of plaintiffs affidavit, defendant is to provide its opposition to plaintiff who will then file the 9A package in Superior Court.

 The sources within the more than 1,000 exhibits are not always referenced.

 Even Lorillard’s corporate representative Leonard Jones testified that he had seen Lorillard documents in his review that stated Newports were designed to appeal to a “youths/youthful” market.

 I accept Dr. Cumming’s testimony that the development of lung cancer caused by smoking usually takes 20-25 years of smoking. Lung cancer caused by smoking in the 1890s caused 145 deaths; by 1962 smoking cigarettes caused 41,000 lung cancer deaths; by 2010 smoking cigarettes caused 160,000 lung cancer deaths. I accept that these are only the smoking-caused lung cancer deaths reported in the U.S.

 I accept that this Frank Statement issued as a result of a series of meetings in NYC in December 1953 of cigarette manufacturers, including this Defendant, all of whom then hired a public relations company to deal with this issue of whether smoking cigarettes causes lung cancer.

 TI was created in 1958 as a spinoff of CTR.

 Defendant’s records indicate that by 1994 Defendant had known for several decades that nicotine was addictive. For *226 almost two decades prior to 1994 Defendant had had a “nicotine enrichment project” specifically designed to have a consistent amount of nicotine present in each cigarette, enough to maintain the smoker’s addiction to nicotine. The videotaped deposition testimony of Defendant’s Senior Operations and Research person, Leroy Broin was also offered. His testimony, given on April 15, 1997, that smoking cigarettes does not cause lung cancer and that nicotine is not addictive was not credible. He did concede that “the base of our business is the high school student." To his credit, Broin also conceded that “if it is proven that smoking caused death, getting out of the business (of selling cigarettes) may be necessary."

 It is unclear what the “RT Information Task Force” is. Given that this memorandum is on Lorillard’s letterhead and reports on the “goal” of the RT Information Task Force, I accept that it at least an organization of which the defendant is a member, if not its own Task Force.

 Though Lorillard argued that, prior to the U.S. v. Philip Morris case and Engle, it frequently prevailed on the same issues it lost on in those cases, and that it would be unfair to apply offensive collateral estoppel on the basis of recent decisions, Lorillard never actually cited examples , of prior cases where it prevailed on the merits of these decisions.

 A certified copy of the Engle decision was marked as 1034 for identification in the record of this case.

 A certified copy of the Philip Morris decision was marked as 1035 for identification in the record of this case.

 The demand letter is a jurisdictional requirement under §9: “[a]t least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent." G.L.c. 93A, §9(3). A plaintiff bringing a claim under §9 must allege the sending of a demand letter as a prerequisite to suit. Boston v. Aetna Life Ins. Co., 399 Mass. 569, 574 (1987).

 The parties agree that because c. 93A was amended in 1979, only Lorillard’s post-1979 conduct is relevant to this claim.

 Restatement (Third) of Torts: Product Liability essentially “reaffirms the principle expressed in [§402A of the] Restatement (Second) of Torts[.)” Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 22 (1998).

 The SJC in Haglund v. Philip Morris, Inc., 446 Mass. 741 (2006), remanded the case back to the Superior Court.

 Prior to trial Lorillard stipulated that Ms. Evans died of small cell lung cancer caused by smoking.

 The jury also determined Lorillard to have breached the implied warranty of merchantability by failing to provide consumers, including Ms. Evans, an adequate warning of the health hazards and/or addictive properties of Newport cigarettes prior to 1970. However, given that the parties agree that this c. 93A action is limited to events after 1979, when c. 93A was amended, see Hershenow v. Enterprise Rent-a-Car Co. of Boston, Inc., 445 Mass. 790, 797-98 (2006), this court will not address failure to warn and will limit its consideration to defective design.

 The jury also determined that Lorillard was negligent in failing to warn Ms. Evans of the health hazards and/or addictive properties of Newport cigarettes prior to 1970; however, because Evans’s c. 93A claim is limited to Lorillard’s post-1979 actions, this court need not consider this additional basis for negligence.

 The Restatement (Second) of Torts §323 (1965), provides: “One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other’s person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of harm, or (b) the harm is suffered because of the other’s reliance upon the undertaking.”

 The jury further found Lorillard to have acted in a maimer that was malicious, willful, wanton or reckless, a determination with which this court agrees.

 The doctrine is grounded in the First Amendment protection of political speech, and “upon a recognition that the antitrust laws, ‘tailored as they are for the business world, are not at all appropriate for application in the political arena.’ ” City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380 (1991), quoting Noerr, 365 U.S. at 141.

 The relevant language of G.L.c. 93A, §9(3) states: “At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injuiy suffered, shall be mailed or delivered to any prospective respondent. Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner. In all other cases, if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two.”

 “[G.L.c. 93A] ‘ties liability for multiple damages to the degree of the defendant’s culpability by creating two classes of defendants.’ Those defendants who have committed ‘relatively innocent violations’ of the statute are not liable for multiple damages, while a second class of defendants who have committed ‘willful or knowing’ violations are.” DataComm Interface v. ComputerWorid, Inc., 396 Mass. 760, 779 (1986).

 Given defendant’s post-trial motion concerning the application of interest, it is possible that an appellate court may determine that prejudgment interest is not appropriate on a punitive damages award under G.L.c. 229, §2, (wrongful death) but are appropriate under c. 93A. In that event, an award under c. 93A would be necessary.

 General Laws c. 93A, §9(4), provides that, “]i]f the court finds in any action commenced hereunder that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys fees and costs incurred in connection with said action].]”

 The fact that Engle and Philip Morris were decided in other states and courts is immaterial. The Full Faith and Credit Clause of the Constitution requires that “the judgment of a State court which had jurisdiction of the parties and the subject-matter in suit, shall be given in the courts of every other State the same credit, validity and effect which it has in the State where it was rendered, and be equally conclusive upon the merits].]” Wright Machine Corp. v. Seaman-Andwall Corp., 364 Mass. 683, 689 (1974), quoting Roche v. McDonald, 275 U.S. 449, 451-52 (1928).

 See also Restatement (Second) of Judgments §29 (1982) (listing eight circumstances forjudge to consider when determining propriety of applying offensive collateral estoppel).